UNITED STATES' DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
DELAWARE DIVISION

|  |  |
|---|---|
| AZUBUKO - <br>    Plaintiff <br><br> vs. <br><br> EASTERN BANK - <br>    Defendant | CIVIL ACTION NUMBER: <br> 05-032-SLR |

**PLAINTIFF'S MOTION FOR COURT TO DETERMINE WHAT PREVAILED – PLAINTIFF'S FIRST MOTION FOR RECONSIDERATIO AND NOTICE OF APPEAL**

These would be the bases for the head:

01) The Plaintiff had no slightest intention to making anyone's work difficult. Surely, the Plaintiff had Motion for Reconsideration and Notice of Appeal pending on the above-captioned case. The Court fertilized ground for it. "No sane wo/man will be chasing mouse when her/his house is engulfed." [Proverb] In essence, the Court did not only fail to grant the Plaintiff's Motion for Emergency Writ of Mandamus/Injunction, but returned it un-docketed. That was insidious and invidious.

02) The Plaintiff was a situational and not modernistic or traditionalistic thinker. Since the Plaintiff did not see the Motion for Reconsideration returned, the Plaintiff deemed it judicious to embark upon the head. "A wise wo/man ought not to eat for eight hours." [Proverb]

03) The Plaintiff had claims that the Court ought to grant the Plaintiff relieves, but the Court elected to do what it deemed responsible, in a manner of speaking or whimsically. [Exhibits 1 and 2]

04) If the Plaintiff had a choice, the Plaintiff would prefer the Court to grant his Motion for Reconsideration rather than the Notice of Appeal: that entailed a great deal of works as the Court knew very well. If the Plaintiff were condemned to it, a journey of hundred miles generally started with a step.

04)   The Plaintiff would snatch at the opportunity to say despite the fact that the Plaintiff filed notice of appeal, it never meant that the Plaintiff had an appeal as an only option for the case presently.  There existed the law, which would compel Judge Robinson to perform its duties in non-discriminatory manners.  [28 USC Section 1364(b) 1982 and 1361]  The Plaintiff would be afraid to say/ing that "The Guardians Are Guided."

## CONCLUSION

The Plaintiff effusively prayed that Judge Robinson would see the needs to respect her oath of office – seeing about the enforcement of the United States' matchless Constitution and law - without fear or favor so help me God.  Consciously, God with the prodigalities of His love and grace would be willing to help Judge Robinson, but would she be willing to give Him a chance?  That rested with the er!  Indeed, a wise wo/man would not be an incubator for injustice.  Justice had been likened to water and nobody had been allergic to it.  Of course, "If God slept, one eye would be opened."  [Proverb]  Could the proverbial Solomon wisdom prevail?  The Plaintiff was not crying for any judicial moon or tokenism!

Respectfully submitted from Boston – Massachusetts – on Tuesday – April 05th – 2005.

CHUKWUMA E. AZUBUKO,
Pro Se,
P. O. Box 1351,
Boston – MA 02117-1351.
(617) 265 6291.

## CERTIFICATE SERVICE

The Plaintiff under the penalties for perjury certified that a true copy of the head was served upon the Defendant – Eastern Bank at its known address – One Eastern Place, Lynn, MA 01901-01901-1508 via the United States' Postal Service prepaid first-class mail on Thursday – April 07th – 2005.

CHUKWUMA E. AZUBUKO,
Pro Se.

Page 2 of 2



# Detroit Free Press
www.freep.com

**News**  **Sports**  **Autos**  **Entertainment**  **Business**  **Features**  **Opinion**

## Auto news

E-MAIL THIS STORY  |  PRINTER-FRIENDLY FORMAT

### Banks consider settling suits



Auto links >
- Detroit Auto Show
- Auto news
- Auto reviews
- Driving Today
- Photo galleries
- Used car prices from Kelley Blue Book
- AP business wire



**SPECIAL REPORT: GM, ASIA AND THE NEW WORLD**

Quick links >
Home page
Site index
View the front page
Weather
Lottery
Comics
Photos
Movie listings
Restaurant guide
Search
Archives
Death notices
Personals
Auto news
Newspaper subscriptions
About the Free Press
Free Press Jobs Page
Bookstore

#### Class actions say 2 let car dealers pad black buyers' rates

*January 18, 2005*

ASSOCIATED PRESS

NEW YORK -- Two major banks are discussing possible settlements of class actions filed by black consumers who contend they were charged more for auto loans than whites, according to a published report.

Any settlement could affect the price of loans taken by millions of auto buyers, although no agreement appears to be near, the Wall Street Journal reported Monday, citing people familiar with the talks.

Plaintiffs attorneys are asking the banks, **Bank of America Corp.** and **J.P. Morgan Chase & Co.'s** Bank One unit, to limit how much auto dealers can add on to the financing rates both banks charge, the newspaper reported. The lawsuits contend dealers increase the cost of the loans more for black borrowers than for whites, and that the banks' policies allow for such discrimination.

Bank of America declined to comment to the Associated Press on Monday. Spokeswoman Shirley Norton told the newspaper that the bank is "in talks" about the case, but declined to characterize the discussion as settlement talks or describe how far they had progressed.

Tom Kelly, a spokesman for J.P. Morgan Chase in Chicago, said, "We are in discussions with plaintiffs' attorneys to resolve the litigation."

The Journal said any settlement could lead to cheaper loans for all car buyers by curbing industry practices that -- beyond the discrimination allegations -- are legal in most states and burnish the dealers' bottom lines.

Trials in the separate cases are expected later this year.

Both banks let dealers add as much as 3 percentage points to the annual percentage rate the banks would offer the consumer based on creditworthiness.

In February 2004, **General Motors Corp.'s** financing unit, General Motors Acceptance Corp., agreed to cap its loan markup at 2.5 percent as part of a settlement of a Tennessee lawsuit.

EXHIBIT 01

http://www.freep.com/money/autonews/carloan18e_20050118.htm                     1/25/2005

Also last year, before it merged with Bank One, J.P. Morgan Chase voluntarily lowered the maximum markup the finance units charge from 3 percent to 2.5 percent. Now, the plaintiffs are asking Bank One to lower its cap as well, the newspaper said.

A study of more than 1.5 million GMAC loans over four years, done for plaintiffs in the Tennessee case, found that blacks paid an average of $1,229 over the life of car loans compared with $867 whites paid.


email this | print this

Related stories >

- Fiat, GM talk to avoid forced sale

- AUTO INDUSTRY REPORT: Plant revamp mulled

- Venture's bankruptcy plan out; auction likely

- 8,000 Ford workers to go wireless



EXHIBIT 01

| 435 U.S 247 (19' | Carey v. Piphus |

Mr. Justice Powell delivered the opinion of the Court.

In this case, brought under 42 U.S.C. ?1983, we consider the elements and prerequisites for recovery of damages by students who were suspended from public elementary and secondary schools without procedural due process. The Court of Appeals for the Seventh Circuit held that the students are entitled to recover substantial nonpunitive damages even if their suspensions were justified, and even if they do not prove that any other actual injury was caused by the denial of procedural due process. We disagree, and hold that in the absence of proof of actual injury, the students are entitled to recover only nominal damages.

I

\* \* \* \* \*

We granted certiorari to consider whether, in an action under ?1983 for the deprivation of procedural due process, a plaintiff must prove that he actually was injured by the deprivation before he may recover substantial "nonpunitive" damages. 430 U.S. 964 (1977).

II

Title 42 U.S.C. ?1983, Rev. Stat. ?1979, derived from ?1 of the Civil Rights Act of 1871, 17 Stat. 13, provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

The legislative history of ?1983, elsewhere detailed, e.g., Monroe v. Pape, 365 U.S. 167, 172-183 (1961); id., at 225-234 (Frankfurter, J., dissenting in part); Mitchum v. Foster, 407 U.S. 225, 238-242 (1972), demonstrates that it was intended to "[create] a species of tort liability" in favor of persons who are deprived of "rights, privileges, or immunities secured" to them by the Constitution. Imbler v. Pachtman, 424 U.S. 409, 417 (1976).

Petitioners contend that the elements and prerequisites for recovery of damages under this "species of tort liability" should parallel those for recovery of damages under the common law of torts. In particular, they urge that the purpose of an award of damages under ?1983 should be to compensate persons for injuries that are caused by the

EXHIBIT 02

deprivation of constitutional rights; and, further, that plaintiffs should be required to prove not only that their rights were violated, but also that injury was caused by the violation, in order to recover substantial damages. Unless respondents prove that they actually were injured by the deprivation of procedural due process, petitioners argue, they are entitled at most to nominal damages.

Respondents seem to make two different arguments in support of the holding below. First, they contend that substantial damages should be awarded under ?1983 for the deprivation of a constitutional right whether or not any injury was caused by the deprivation. This, they say, is appropriate both because constitutional rights are valuable in and of themselves, and because of the need to deter violations of constitutional rights. Respondents believe that this view reflects accurately that of the Congress that enacted ?1983. Second, respondents argue that even if the purpose of a ?1983 damages award is, as petitioners contend, primarily to compensate persons for injuries that are caused by the deprivation of constitutional rights, every deprivation of procedural due process may be presumed to cause some injury. This presumption, they say, should relieve them from the necessity of proving that injury actually was caused.

A

Insofar as petitioners contend that the basic purpose of a ?1983 damages award should be to compensate persons for injuries caused by the deprivation of constitutional rights, they have the better of the argument. Rights, constitutional and otherwise, do not exist in a vacuum. Their purpose is to protect persons from injuries to particular interests, and their contours are shaped by the interests they protect.

Our legal system's concept of damages reflects this view of legal rights. "The cardinal principle of damages in Anglo-American law is that of compensation for the injury caused to plaintiff by defendant's breach of duty." 2 F. Harper & F. James, Law of Torts ?25.1, p. 1299 (1956) (emphasis in original). The Court implicitly has recognized the applicability of this principle to actions under ?1983 by stating that damages are available under that section for actions "found... to have been violative of... constitutional rights and to have caused compensable injury...." Wood v. Strickland, 420 U.S., at 319 (emphasis supplied); see Codd v. Velger, 429 U.S. 624, 630-631 (1977) (Brennan, J., dissenting); Adickes v. S. H. Kress & Co., 398 U.S. 144, 232 (1970) (Brennan, J., concurring and dissenting); see also Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388, 397 (1971) (action for damages directly under Fourth Amendment); id., at 408-409 (Harlan, J., concurring in judgment). The lower federal courts appear generally to agree that damages awards under ?1983 should be determined by the compensation principle.

The Members of the Congress that enacted ?1983 did not address directly the question of damages, but the principle that damages are designed to compensate persons for injuries caused by the deprivation of rights hardly could have been foreign to the many lawyers in Congress in 1871. Two other sections of the Civil Rights Act of 1871 appear to incorporate this principle, and no reason suggests itself for reading ?1983 differently. To the extent that Congress intended that awards under ?1983 should deter the deprivation of constitutional rights, there is no evidence that it meant to



EXHIBIT 02

establish a deterrent more formidable than that inherent in the award of compensatory damages. See Imbler v. Pachtman, 424 U.S., at 442 (White, J., concurring in judgment).

B

It is less difficult to conclude that damages awards under ?1983 should be governed by the principle of compensation than it is to apply this principle to concrete cases. But over the centuries the common law of torts has developed a set of rules to implement the principle that a person should be compensated fairly for injuries caused by the violation of his legal rights. These rules, defining the elements of damages and the prerequisites for their recovery, provide the appropriate starting point for the inquiry under ?1983 as well.

It is not clear, however, that common-law tort rules of damages will provide a complete solution to the damages issue in every ?1983 case. In some cases, the interests protected by a particular branch of the common law of torts may parallel closely the interests protected by a particular constitutional right. In such cases, it may be appropriate to apply the tort rules of damages directly to the ?1983 action. See Adickes v. S. H. Kress & Co., 398 U.S., at 231-232 (Brennan, J., concurring and dissenting). In other cases, the interests protected by a particular constitutional right may not also be protected by an analogous branch of the common law of torts. See Monroe v. Pape, 365 U.S., at 196, and n. 5 (Harlan, J., concurring); id., at 250-251 (Frankfurter, J., dissenting in part); Adickes v. S. H. Kress & Co., supra, at 232 (Brennan, J., concurring and dissenting); Bivens v. Six Unknown Fed. Narcotic Agents, 403 U.S., at 394; id., at 408-409 (Harlan, J., concurring in judgment). In those cases, the task will be the more difficult one of adapting common-law rules of damages to provide fair compensation for injuries caused by the deprivation of a constitutional right.

Although this task of adaptation will be one of some delicacy as this case demonstrates it must be undertaken. The purpose of ?1983 would be defeated if injuries caused by the deprivation of constitutional rights went uncompensated simply because the common law does not recognize an analogous cause of action. Cf. Jones v. Hildebrant, 432 U.S. 183, 190-191 (1977) (White, J., dissenting); Sullivan v. Little Hunting Park, 396 U.S. 229, 240 (1969). In order to further the purpose of ?1983, the rules governing compensation for injuries caused by the deprivation of constitutional rights should be tailored to the interests protected by the particular right in question just as the common-law rules of damages themselves were defined by the interests protected in the various branches of tort law. We agree with Mr. Justice Harlan that the experience of judges in dealing with private [tort] claims supports the conclusion that courts of law are capable of making the types of judgment concerning causation and magnitude of injury necessary to accord meaningful compensation for invasion of [constitutional] rights." Bivens v. Six Unknown Fed. Narcotics Agents, supra, at 409 (Harlan, J., concurring in judgment). With these principles in mind, we now turn to the problem of compensation in the case at hand.

C

The Due Process Clause of the Fourteenth Amendment provides:



EXHIBIT 02

"[N]or shall any State deprive any person of life, liberty, or property, without due process of law...."

This Clause "raises no impenetrable barrier to the taking of a person's possessions," or liberty, or life. Fuentes v. Shevin, 407 U.S. 67, 81 (1972). Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property. Thus, in deciding what process constitutionally is due in various contexts, the Court repeatedly has emphasized that "procedural due process rules are shaped by the risk of error inherent in the truth-finding process...." Mathews v. Eldridge, 424 U.S. 319, 344 (1976). Such rules "minimize substantively unfair or mistaken deprivations of" life, liberty, or property by enabling persons to contest the basis upon which a State proposes to deprive them of protected interests. Fuentes v. Shevin, supra, at 81.

In this case, the Court of Appeals held that if petitioners can prove on remand that "[respondents] would have been suspended even if a proper hearing had been held," 545 F. 2d, at 32, then respondents will not be entitled to recover damages to compensate them for injuries caused by the suspensions. The court thought that in such a case, the failure to accord procedural due process could not properly be viewed as the cause of the suspensions. Ibid.; cf. Mt. Healthy City Board of Ed. v. Doyle, 429 U.S. 274, 285-287 (1977); Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 270-271, n. 21 (1977). The court suggested that in such circumstances, an award of damages for injuries caused by the suspensions would constitute a windfall, rather than compensation, to respondents. 545 F. 2d, at 32, citing Hostrop v. Board of Junior College Dist. No. 515, 523 F. 2d, at 579; cf. Mt. Healthy City Board of Ed. v. Doyle, supra, at 285-286. We do not understand the parties to disagree with this conclusion. Nor do we.

The parties do disagree as to the further holding of the Court of Appeals that respondents are entitled to recover substantial although unspecified damages to compensate them for "the injury which is 'inherent in the nature of the wrong,'" 545 F. 2d, at 31, even if their suspensions were justified and even if they fail to prove that the denial of procedural due process actually caused them some real, if intangible, injury. Respondents, elaborating on this theme, submit that the holding is correct because injury fairly may be "presumed" to flow from every denial of procedural due process. Their argument is that in addition to protecting against unjustified deprivations, the Due Process Clause also guarantees the "feeling of just treatment" by the government. Anti-Fascist Committee v. McGrath, 341 U.S. 123, 162 (1951) (Frankfurter, J., concurring). They contend that the deprivation of protected interests without procedural due process, even where the premise for the deprivation is not erroneous, inevitably arouses strong feelings of mental and emotional distress in the individual who is denied this "feeling of just treatment." They analogize their case to that of defamation per se, in which "the plaintiff is relieved from the necessity of producing any proof whatsoever that he has been injured" in order to recover substantial compensatory damages. C. McCormick, Law of Damages ?116, p. 423 (1935).

Petitioners do not deny that a purpose of procedural due process is to convey to the individual a feeling that the government has dealt with him fairly, as well as to minimize the risk of mistaken deprivations of protected interests. They go so far as to


EXHIBIT 02

concede that, in a proper case, persons in respondents' position might well recover damages for mental and emotional distress caused by the denial of procedural due process. Petitioners' argument is the more limited one that such injury cannot be presumed to occur, and that plaintiffs at least should be put to their proof on the issue, as plaintiffs are in most tort actions.

We agree with petitioners in this respect. As we have observed in another context, the doctrine of presumed damages in the common law of defamation per se "is an oddity of tort law, for it allows recovery of purportedly compensatory damages without evidence of actual loss." Gertz v. Robert Welch, Inc., 418 U.S. 323, 349 (1974). The doctrine has been defended on the grounds that those forms of defamation that are actionable per se are virtually certain to cause serious injury to reputation, and that this kind of injury is extremely difficult to prove. See id., at 373, 376 (white, J., dissenting). Moreover, statements that are defamatory per se by their very nature are likely to cause mental and emotional distress, as well as injury to reputation, so there arguably is little reason to require proof of this kind of injury either. But these considerations do not support respondents' contention that damages should be presumed to flow from every deprivation of procedural due process.

First, it is not reasonable to assume that every departure from procedural due process, no matter what the circumstances or how minor, inherently is as likely to cause distress as the publication of defamation per se is to cause injury to reputation and distress. Where the deprivation of a protected interest is substantively justified but procedures are deficient in some respect, there may well be those who suffer no distress over the procedural irregularities. Indeed, in contrast to the immediately distressing effect of defamation per se, a person may not even know that procedures were deficient until he enlists the aid of counsel to challenge a perceived substantive deprivation.

Moreover, where a deprivation is justified but procedures are deficient, whatever distress a person feels may be attributable to the justified deprivation rather than to deficiencies in procedure. But as the Court of Appeals held, the injury caused by a justified deprivation, including distress, is not properly compensable under ?1983. This ambiguity in causation, which is absent in the case of defamation per se, provides additional need for requiring the plaintiff to convince the trier of fact that he actually suffered distress because of the denial of procedural due process itself.

Finally, we foresee no particular difficulty in producing evidence that mental and emotional distress actually was caused by the denial of procedural due process itself. Distress is a personal injury familiar to the law, customarily proved by showing the nature and circumstances of the wrong and its effect on the plaintiff. In sum, then, although mental and emotional distress caused by the denial of procedural due process itself is compensable under ?1983, we hold that neither the likelihood of such injury nor the difficulty of proving it is so great as to justify awarding compensatory damages without proof that such injury actually was caused.

D

The Court of Appeals believed, and respondents urge, that cases dealing with awards



EXHIBIT 02

of damages for racial discrimination, the denial of voting rights, and the denial of Fourth Amendment rights support a presumption of damages where procedural due process is denied. Many of the cases relied upon do not help respondents because they held or implied that some actual, if intangible, injury must be proved before compensatory damages may be recovered. Others simply did not address the issue. More importantly, the elements and prerequisites for recovery of damages appropriate to compensate injuries caused by the deprivation of one constitutional right are not necessarily appropriate to compensate injuries caused by the deprivation of another. As we have said, supra, at 258-259, these issues must be considered with reference to the nature of the interests protected by the particular constitutional right in question. For this reason, and without intimating an opinion as to their merits, we do not deem the cases relied upon to be controlling.

III

Even if respondents' suspensions were justified, and even if they did not suffer any other actual injury, the fact remains that they were deprived of their right to procedural due process. "It is enough to invoke the procedural safeguards of the Fourteenth Amendment that a significant property interest is at stake, whatever the ultimate outcome of a hearing...." Fuentes v. Shevin, 407 U.S., at 87; see Codd v. Velger, 429 U.S., at 632 (Stevens, J., dissenting); Coe v. Armour Fertilizer Works, 237 U.S. 413, 424 (1915).

Common-law courts traditionally have vindicated deprivations of certain "absolute" rights that are not shown to have caused actual injury through the award of a nominal sum of money. By making the deprivation of such rights actionable for nominal damages without proof of actual injury, the law recognizes the importance to organized society that those rights be scrupulously observed; but at the same time, it remains true to the principle that substantial damages should be awarded only to compensate actual injury or, in the case of exemplary or punitive damages, to deter or punish malicious deprivations of rights.

Because the right to procedural due process is "absolute" in the sense that it does not depend upon the merits of a claimant's substantive assertions, and because of the importance to organized society that procedural due process be observed, see Boddie v. Connecticut, 401 U.S. 371, 375 (1971); Anti-Fascist Committee v. McGrath, 341 U.S., at 171-172 (Frankfurter, J., concurring), we believe that the denial of procedural due process should be actionable for nominal damages without proof of actual injury. We therefore hold that if, upon remand, the District Court determines that respondents' suspensions were justified, respondents nevertheless will be entitled to recover nominal damages not to exceed one dollar from petitioners.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

Mr. Justice Marshall concurs in the result.



EXHIBIT 02

Mr. Justice Blackmun took no part in the consideration or decision of this case.



Nkrumah E. Azubuko
P.O. Box 1351
Boston, Mass.

Office of the Clerk
U.S. District Court
844 N. King Street,
Lockbox 18,
Wilmington, DE 19801-3570

